**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dan PHELPS, a/k/a Al, a/k/a Sly Fox, Sally Phelps, a/k/a Ginger, a/k/a Rachel, a/k/a Linda, a/k/a Ann, Defendants-Appellants.**

**No. 83–5533.**

United States Court of Appeals,
Eleventh Circuit.

June 7, 1984.

Charles Auslander, Asst. Federal Public Defender, Miami, Fla., for defendants-appellants.

Ken Noto, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

* Honorable Howard T. Markey, Chief Judge, U.S. Court of Appeals for the Federal Circuit, sitting by designation.

1. **§ 371. Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

2. **§ 2421. Transportation generally**

Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman, or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or

Whoever knowingly procures or obtains any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the

Before FAY, ANDERSON and MARKEY,* Circuit Judges.

MARKEY, Chief Judge:

Dan and Sally Phelps (the Phelps) appeal a conviction of conspiracy to commit an offense against or defraud the United States in violation of 18 U.S.C. § 371 (Count I),[1] and transporting and causing transportation of women from Denver, Colorado to Florida for immoral purposes, in violation of the Mann Act 18 U.S.C. §§ 2421 and 2422 (Count VI).[2] We *affirm.*

## Background

In October, 1982, acting on information from a confidential informant, Dennis R.

United States, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the United States—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**§ 2422. Coercion or enticement of female**

Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Fagan, Special Agent, United States Customs Service (Fagan), began an undercover operation in the Southern District of Florida. His purpose was to ascertain whether certain individuals had the capacity and willingness to "launder" money. Particularly, the government sought to determine whether certain escort services were being used as a front to move money outside the United States from whence it could be returned for use in legitimate business. The government negotiated to purchase thirteen escort services in West Palm Beach, in the Southern District of Florida. Recorded meetings and telephone calls resulted in identification of the Phelps and the co-defendants.

The first undercover meeting occurred on November 9, 1982, at the law offices of Robert F. Eimers (Eimers) and Craig Patton (Patton). Agents had previously established contact with Dan Phelps, an owner of the escort services under negotiation. Eimers and Patton represented the Phelps as sellers of the escort services. Fagan testified at trial that his purpose at this meeting was to identify individuals engaged in laundering money and to learn whether the escort services were involved in prostitution.

Throughout the taped conversations at the meeting, Eimers and Patton made explicit representations concerning operation of the escort services, their methods of avoiding detection, and means of covering up acts of prostitution, including sham use of independent contracts purporting to insulate the owners, taking of nude photographs of escorts to prevent undercover police infiltration, use of public service licenses and advertising in the yellow pages, and use of telephone devices in dealing with customers. Patton made clear at this meeting that the Phelps wanted to sell the escort services for two hundred fifty thousand dollars, and that the money transfer could be handled with guaranteed anonymity.

A second undercover meeting was held on November 14, 1982, at a hotel restaurant. Present were Fagan, undercover agent Edward Diamond, and Eimers. Fagan sought to establish further that the escort services were involved in prostitution and how money would be laundered from Miami through the Bahamas. The tape of this meeting does not contain the Phelps' voices, and it was not played at trial. Counsel for Patton was denied use of the tape at trial, but the district court read a summary to the jury.

An audio tape involving the Phelps was made at a meeting at the law offices of Eimers and Patton on November 16, 1982. The discussion during the first part of the meeting centered on explicit operational details of the escort services and Phelps' demand for ten thousand dollars good faith money before allowing the agents to see the physical layout of the escort services. At one point Dan Phelps boasted about his and Sally's twenty-five years experience in the business. Sally Phelps explained how absolutely no records were kept and that everything was shredded daily. Dan Phelps stated that he is "... a merchant of time. It's very beautiful and very nice". During the latter part of the meeting, the Phelps having left, Eimers and Patton repeated the need for ten thousand dollars good faith money and for creating a structure to begin laundering money.

A fourth meeting, with Dan and Sally Phelps present, was arranged for the evening of November 22, 1982. The agents met first that evening with Eimers and gave him ten thousand dollars in cash. They then met with the Phelps, who, as Fagan testified, showed him documents relating to the escort service. A more detailed meeting, during which agents would actually see the operation, was planned for the next day.

On November 23, 1982, the agents were taken to a boat named "Isis II". On board, the Phelps showed the agents paperwork on how the escorts were paid and the fee split with the service. Sally Phelps explained how documents were shredded on a shredder in the rear of the boat. An individual named "Leon" was present. He had made a collection from escorts and was carrying a bag.

The Phelps then took the agents to an escort service location at 3632 North Lake Boulevard in West Palm Beach (Boulevard location). Documents, telephone numbers, and a telephone operator were viewed at that location. At that time, Dan Phelps said Eimers would launder the sale proceeds for him in the Bahamas, and that he knew Eimers would do the same for the agents. Sally Phelps sat next to Dan Phelps when he made that statement.

Arrangements were completed to have the government's purchase money flown to and laundered in the Bahamas on November 24, 1982. Immediately before departure of the plane, piloted by Charles Flowers (Flowers), government agents arrested Eimers and Flowers. The remaining defendants were then arrested.

### The Indictment

The government filed a seven count indictment in the United States District Court for the Southern District of Florida on December 22, 1982. Count I charged the Phelps, Eimers, Patton, Flowers, William Workman and Sherry Workman (Workmans) with conspiracy to commit an offense against or defraud the United States in violation of 18 U.S.C. § 371. The alleged objectives of the conspiracy were: (a) to refrain, while violating 18 U.S.C. § 1952, from filing Customs Form 4790 required in connection with transportation of U.S. currency; (b) to use wire communication and other facilities in interstate commerce to and from the State of Florida for promotion of a business enterprise involving prostitution in violation of Florida law; and (c) to defraud the United States and the Customs Service by impairing and obstructing its lawful governmental function in gathering information on U.S. Customs Form 4790. The trial court struck objective (c).

Count II charged the Phelps, Eimers, Patton, and Flowers with the substantive violation of failure to file U.S. Customs Form 4790 and violation of 18 U.S.C. § 1952, 31 U.S.C. §§ 5316, 5322(b), and 18 U.S.C. § 2.

Counts III through V charged the Phelps with the use of facilities in interstate commerce and interstate or foreign travel in promoting and managing prostitution in Florida, in violation of 18 U.S.C. §§ 2 and 1952.

Count VI charged the Phelps with transporting and causing the transportation of women from Denver, Colorado to Florida for immoral purposes, in violation of 18 U.S.C. §§ 2421 and 2422.

Count VII charged the Phelps with misuse of a vessel (Isis II) in violation of 18 U.S.C. §§ 2 and 2274.

A jury trial began June 6, 1983.

### District Court Proceedings

Before trial, the Phelps had moved for a psychiatric evaluation of Harold Yearout (Yearout), a government witness. The government opposed and moved *in limine* to preclude defendants from cross examining Yearout about medical or psychiatric treatment in 1967, because Yearout would be testifying about events he witnessed in 1981–1982. At that point, the court denied both motions.

Immediately before Yearout's testimony, the court again denied the Phelps' motion for a medical evaluation and granted the government's motion to the extent that:

> ... the witness may be interrogated with respects to matters having to do with psychiatric condition or medical condition as it might be relevant to his ability to remember and testify properly for a period of five years prior to the date of the appearances to which he will testify and assuming that none of those are prior to 1981 that would allow Defendants to interrogate him as to such conditions as early as 1976, and those are the rulings that are made. After I reviewed these medical records and the authorities that are available to us, those are the rulings.

Yearout testified that he first came to Florida from Colorado in 1979, and identified Sally Phelps (also known as Linda) as one for whom he had worked directly in the prostitution business and who had paid his

salary. Yearout testified that during 1980, he went back to Colorado, returned to Florida, and again left Florida to return to Colorado in the spring of 1981. During 1981, Phelps had telephone contact with him from Florida. Yearout testified that Sally Phelps offered him a two hundred dollar bonus to bring girls to Florida to work in the escort service. Yearout further testified that he and his wife did bring a woman back to Florida in response to that offer.

Arriving in Florida, Yearout said he worked for the Phelps, answering phones, collecting and delivering money, and running errands. He said he answered phones at the Boulevard location, from which calls could be transferred to different locations. He further testified that he filled out contracts and took pictures of escorts. He explained how the escorts would use credit cards and how customers bills would be "doctored up". Essentially, Yearout testified that he did what the Phelps told him in the conduct of a prostitution business.

Allison St. John (St. John), Laura Louise Kearney (Kearney), Kathy Lynn Lewis (Lewis), and Marilyn Liszewski (Liszewski) testified that they had been employed as escorts. Each said she had responded to a newspaper ad and filed an application at the Boulevard location, where she met "Leon", was photographed nude, and filled out an employment contract. They explained the operation of the escort service, use of the telephone, fee structure, and fee split. Each identified Sally Phelps as "Rachael", and said she talked with "Rachael" while working for the escort service.

St. John testified that Leon told her the only reason escorts signed employment contracts was, ". . . because we are saying we are not a cop". She also said she recognized the voice of Dan Phelps as that of a person who had talked to her about her work at the escort service. Liszewski and St. John testified that they had performed sex while employed by Phelps' escort service and that half the money paid them for that performance was turned over to the escort service. Liszewski said Leon turned the money over to "Rachael and Al". Kearney did not say she performed sex, but did say she turned the service's split over to Leon.

Sergeant Al Bonanni (Bonanni), supervisor, North Regional Vice, Metro Dade Police Department, had investigated escort services and examined their books and records. He assisted federal agents in examining documents seized from the Boulevard location and the Isis II. He observed the shredder on the boat, which he said was common equipment in the call-girl-masquerading-as-escort business, because its operators destroy records as soon as possible. He examined numerous of the seized documents, including a "bad" list used by illegitimate escort services to avoid undercover law enforcement officers or customers who might harm the prostitute.

Bonanni testified that illegitimate escort service operators do not admit that they are engaged in prostitution but represent that they are in the referral service or sell time. Based on his expertise and review of the records, he concluded that the escort services involved in this case were a call-girl operation dealing in prostitution.

Bonanni agreed that an escort service not providing prostitutes is legal in Florida, that the occupational licenses issued in this case were for escort services, and that those engaged in prostitution enterprises rarely sought licenses.

As above indicated, counsel for Patton asked to play to the jury the tape recording of the November 14, 1982 meeting, asserting that it contained exonerating passages respecting Patton's lack of intent to join the money laundering conspiracy. Because of background restaurant noises, the quality of the recording was poor. The district court deemed the evidence on the tape relevant to Patton's defense but noted that introduction of the tape itself would require severance of pilot Flowers.

All defendants save Patton objected to the court's reading of a summary of a transcript of the tape, saying it would prejudice them and make the court a witness and advocate. Ruling that it would read a summary into evidence, the court said:

THE COURT: You may step down, Mr. Woodworth. Now, ladies and gentlemen of the Jury, I am going to read to you a summary and short explanation of a tape of a meeting which occurred November 14, 1982. Now, this summary is as follows: "Defendant Patton's Exhibit Number 9, which has been marked for identification only, is a tape of—is a tape recording of a November 14, 1982 meeting between Robert Eimers, Dennis Fagan and Ed Diamond in a Palm Beach County restaurant bar. The meeting occurred in the evening and lasted approximately ninety minutes.

After exchanging greetings, Eimers encourages the others to purchase the escort services by stating prostitution is part of the business, [sic, "."] regarding [sic, "Regarding"] method of transferring payment for the purchase, as well as other sums which belong to the purchasers. [sic, ","] Eimers states that he will provide a means of illegally transporting currency from the United States to assure that the purchasers' identity remains anonymous. Eimers then states that his partner, Craig Patton, has reservations regarding the matters discussed. The recording of this conversation is not being played and you are not receiving transcripts because the voice quality of the tape is extremely poor due to extraneous noise from the restaurant-bar.

"Now, the parties have not agreed that this summary which I have just read to you accurately reflects the content of the November 14, 1982 meeting of Robert Eimers, Dennis Fagan, Ed Diamond, but I have reviewed the transcript and have ruled that it is a fair summary of that transcript, and I think this short statement of portions of the transcript which are relevant to the defense of Patton adequately and fairly explained by this summary which I am reading to you here."

So you are to consider my statement, that is my summary of what that tape shows along with all the other evidence which you have in the case which deals with the guilt or innocence of the Defendant Patton and of his defense only, so with that explanation, we can proceed to your next witness.

### The Verdict

The district court dismissed Count IV of the indictment. On June 21, 1983, the jury returned a verdict finding the Phelps guilty on Counts I and VI.[3]

Motions for judgment of acquittal and new trial were denied. A judgment and commitment order was entered, sentencing the Phelps to three years incarceration on count one and to five years probation on count six.

### Issues

(1) Whether the evidence was sufficient to support the jury's verdict.

(2) Whether the limitation of cross examination on the psychiatric condition of Yearout to 1976 and later denied the Phelps the constitutional right to confront the witness.

(3) Whether reading the evidentiary summary of the tape violated the Phelps' constitutional rights to trial by jury and to confront witnesses.

(4) Whether the refusal to give an instruction on legality of escort services was an abuse of discretion.

### OPINION

#### (1) *Sufficiency of the Evidence*

■ Arguing that the district court should have granted their motion for acquittal, the Phelps point to particular segments of the evidence and to inferences they would have us draw from those segments. That approach is not, however, open to us. In evaluating sufficiency of the evidence, we view it in a light most favorable to the government and accept all

---

**3.** Eimers, who fled the jurisdiction, was tried and convicted on Counts I and II of the indictment and sentenced in absentia. Workmans' motions for severance were granted by the District Court and their motion to dismiss was granted as to Count IV, the only count on which they were indicted. Patton and Flowers were found not guilty on all counts.

reasonable inferences and credibility choices tending to support the verdict, *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974), *United States v. Alfrey*, 620 F.2d 551, 555 (5th Cir.), *cert. denied*, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), *United States v. Marx*, 635 F.2d 436, 438 (5th Cir.1981), whether the evidence be direct or circumstantial, *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971), and will overturn a verdict only when the jury must necessarily have had a reasonable doubt, *United States v. Marx, supra, United States v. Arredondo-Morales*, 624 F.2d 681, 684 (5th Cir.1980).

The evidence described above cannot be seen as insufficient to support a verdict that the Phelps had been proven guilty beyond a reasonable doubt of conspiracy to commit an offense against or defraud the United States and of causing the transportation of a woman in interstate commerce for immoral purposes.

■ Evidence was presented that the Phelps conspired with the co-defendants to transfer money out of the United States to the Bahamas in a secret, illegal, unreported manner. The jury could have found from that evidence that the agreement was to transfer the proceeds of the sale of the escort business and that the overt act in furtherance of that agreement was the attempted flight. *See United States v. Arredondo-Morales, supra* at 683; *United States v. White*, 569 F.2d 263 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). The jury could validly have found a common purpose and plan from the actions of the participants and from the circumstantial evidence of the scheme. *See United States v. Conway*, 632 F.2d 641, 643 (5th Cir.1980).

■ The evidence was further sufficient to enable the jury to find beyond a reasonable doubt that the Phelps owned and operated a sophisticated, highly organized prostitution service in West Palm Beach. Evidence was presented of numerous cover-up devices, including independent contracts, false names, photographing escorts in the nude, phone call transfers, and continuous shredding of records. The jury had the right to believe the testimony of the escorts who said they performed sex for pay in response to phone calls to the services, while working for and splitting that pay with the Phelps. It had the right to believe Yearout, who said he brought a woman from Colorado to Florida to engage in prostitution at the request of and for payment offered by Sally Phelps. From Yearout's testimony the jury cannot be faulted in concluding that the Phelps used wire communication facilities and facilitated travel in interstate commerce to and from Florida in promoting and managing a prostitution business.

The Phelps have shown no basis in the record for concluding that the jury must necessarily have had a reasonable doubt of guilt on Counts I and VI. The verdict cannot, therefore be overturned for insufficiency of evidence and the district court correctly denied the Phelps' motion for acquittal. *United States v. Marx, supra; United States v. Arredondo-Morales, supra.*

### (2) *Cross-Examination*

Citing *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir.1983), for the proposition that "certain forms of mental disorder have high probative value on the issue of credibility", the Phelps contend that the district court's limitation on the scope of cross-examination of Yearout was so egregious as to amount to a denial of the constitutional right to confront the witness.

■ The Sixth Amendment to the Constitution of the United States guarantees every accused the right to confront the witnesses against him. That right includes the right to cross-examine. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). The scope and extent of cross-examination is within the sound discretion of the trial judge. *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Contreras*, 602 F.2d 1237, 1239 (5th Cir.), *cert. denied*, 444 U.S. 971, 100

S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. Holman*, 680 F.2d 1340, 1350 (11th Cir.1982). Cross-examination of a government "star" witness is important, *United States v. Summers*, 598 F.2d 450, 460 (5th Cir.1979), and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness, *Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir.1981), *United States v. Williams*, 592 F.2d 1277, 1281 (5th Cir.1979), *United States v. Barrentine*, 591 F.2d 1069, 1081 (5th Cir.), *cert. denied*, 444 U.S. 990, 100 S.Ct. 521, 62 L.Ed.2d 419 (1979), but cross-examination must be relevant. *Greene v. Wainwright, supra; United States v. Love*, 599 F.2d 107, 108 (5th Cir.), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979).

■ The district court here committed no abuse of discretion. It allowed cross-examination of Yearout concerning his "psychiatric condition or medical condition" from as long as five years before the time of the critical events about which he testified on direct and up to the day of his testimony. The court limited the scope of cross-examination to exclude only events deemed so remote in time as to be irrelevant to Yearout's credibility or ability to remember. Yearout was available for extensive cross-examination by questions on his psychiatric condition relevant to his ability to observe and remember during all the years mentioned in his testimony (1979–1982), and for the three previous years. That was more than adequate to place before the jury Yearout's mental condition at all times (1981–1982) pertinent to this case and to the critical events about which he testified. *See United States v. Pommerening*, 500 F.2d 92, 100 (10th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974).

It cannot be said that refusal to permit cross-examination about a psychiatric treatment in 1967, an event that occurred 14 years before the critical events testified about, or about mental condition factors earlier than 1976, constituted an abuse of discretion amounting to a denial of the right of confrontation. In *Lindstrom, su-*pra, this court noted the concurrency of denied medical records with the events testified to, cited *United States v. Partin*, 493 F.2d 750, 763–64 (5th Cir.1974), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), for the requirement that the jury receive evidence of mental defect or treatment "at a time probatively related" to the events testified to, and distinguished *United States v. Diecidue*, 603 F.2d 535 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), because the excluded medical record was that of an isolated mental illness occurring 12 years before the events at issue in the case and was "temporally remote from and therefore not probatively related to, the time period about which the witness was testifying". The fact pattern in the present case is more fully akin to that in *Diecidue* than it is to that in *Lindstrom* or *Partin*. The Phelps' right of confrontation was not denied. *See United States v. Sonntag*, 684 F.2d 781, 788 (11th Cir.1982).

(3) *Evidentiary Summary*

■ The Phelps' contention that the court's reading the summary forced the jury to determine that they engaged in the prostitution business and usurped the jury function must fail.

The summary makes no mention of the Phelps. It does include Eimers' statement that prostitution is part of the business the sale of which he was trying to encourage, and other evidence established the Phelps' ownership of that business, but it was the evidence set out above, not Eimers' statement, that enabled the jury to determine that the Phelps were engaged in the prostitution business. In light of the accompanying instructions, reading of the summary was not what "advised the jury that the Phelps were engaged in the prostitution business" as the Phelps assert.

■ Nor did the court's reading the summary usurp the jury's function in determining the guilt or innocence of the Phelps. The jury was concurrently informed that the parties did not agree that the summary accurately reflected the content of the tape. The court accompanied the summary

with a concurrent instruction that the jury must consider it with all other evidence offered in Patton's defense, and must do so *only* in relation to Patton's defense. The law presumes that the jury will follow the court's instructions, *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), and nothing of record supports the assertion that the jury was confused or unable to follow the limiting instruction of the court. On the contrary, the jury found Patton and Flowers innocent while finding the Phelps guilty, indicating its adherence to the court's instructions and its careful evaluation and application of the evidence.

An accused is entitled to a fair, not a perfect, trial. *United States v. Johnson,* 713 F.2d 633 (11th Cir.1983); *United States v. Blasco,* 702 F.2d 1315 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 275, 78 L.Ed.2d 256 (1984). The Phelps do not challenge here the accuracy of the summary and no defendant presented a different version to the court. *See United States v. Onori,* 535 F.2d 938, 948–49 (5th Cir.1976). No basis appears in the record to support a finding that the court's reading of the summary resulted in denial to the Phelps of a fair trial or of the right to confront a witness.

The procedure employed by the trial court in dealing with the November 14, 1982 tape recording was not proper. The same person cannot be or reasonably appear to be witness and presiding judge at a trial. Any procedure having that result must be unequivocally condemned. Because, however, each of the facts in the summary allegedly affecting the Phelps was fully established in other evidence, the error is in the present case harmless. In sum, the court's reading of the summary *cum* instructions did not infringe upon the Phelps' right to a fair trial. *See, Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946).

### (4) *Requested Instruction*

It is asserted that the district court abused its discretion in refusing this "theory of defense" instruction: "You are instructed that escort services and dating services are legitimate businesses in the United States. Mere ownership of such a business is not a violation of any law." There was, however, no basis in the record for that instruction and its refusal could not therefore have been an abuse of discretion. The Phelps were not charged with ownership or operation of an escort or dating service, and the requested instruction could not have assisted the jury in resolving the issues presented to it. Those issues arose from the manner of conducting a business, and raised no question of whether the business would be legitimate if not conducted in the manner charged. Because ownership of escort and dating services could form no basis for a theory of defense against the charges set forth in the indictment, the requested instruction was purely argumentative and a trial judge is under no obligation to give an argumentative instruction. *Pass v. Firestone Tire & Rubber Co.,* 242 F.2d 914, 920 (5th Cir. 1957).

The instructions taken as a whole correctly and fairly charged the jury in relation to the issues and correctly stated the law. *See United States v. Arguelles,* 594 F.2d 109, 112 n. 3 (5th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Chandler,* 586 F.2d 593, 606 (5th Cir.1978), *cert. denied,* 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). No abuse of discretion occurred in refusing to give the requested "defense theory" instruction. *See United States v. Veal,* 703 F.2d 1224 (11th Cir.1983).

### *Conclusion*

The evidence was sufficient to support the verdicts of guilty on the charges of conspiracy and of violating the Mann Act. Limitation of cross-examination to the mental condition of Yearout in 1976 and later was not an abuse of discretion and did not deny the Phelps their right to confront the witness. Reading the evidentiary summary of the November 14, 1982 tape did not violate the Phelps' rights to trial by jury and to confront witnesses. Refusal of the requested instruction on the legality of es-

cort services was not an abuse of discretion.

The convictions are AFFIRMED.

AFFIRMED.