[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 23, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-15073

_____

D.C. Docket No. 02-00103-CR-FTM-29-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL J. LYONS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 23, 2005)

Before MARCUS, FAY and SILER[*], Circuit Judges.

MARCUS, Circuit Judge:

_____

[*]Honorable Eugene E. Siler, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Daniel L. Lyons appeals his conviction for possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g), and the 235-month sentence the district court imposed based on his status as an "armed career criminal," pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4(b). On appeal, Lyons argues that: (1) the district court erred by denying his pre-trial motion to suppress four bullets found on his person during a search incident to his arrest for disorderly conduct, a violation of Fla. Stat. § 877.03; (2) the district court erred by granting the government's motion in limine to exclude evidence of Lyons's state-court acquittal on the § 877.03 charges; and (3) the imposition of a 235-month "armed career criminal" sentence constitutes cruel and unusual punishment, in violation of the Eighth Amendment.

We apply a mixed standard of review to the denial of a defendant's motion to suppress, reviewing the district court's findings of fact for clear error and its application of law to those facts de novo. United States v. Desir, 257 F.3d 1233, 1235-36 (11th Cir. 2001). We review a district court's evidentiary rulings for abuse of discretion. See United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc), petition for cert. filed, No. 04-8324 (Jan. 13, 2005). As for Lyons's constitutional challenge to his sentence, our review is de novo. See United States v. Reynolds, 215 F.3d 1210, 1212 (11th Cir. 2000).

Upon thorough review of the record, as well as careful consideration of the parties' briefs and oral argument, we find no reversible error and affirm.

## I.

The relevant facts are straightforward. On November 13, 2002, Lyons was indicted in one count for possession of ammunition (four Remington .22 caliber bullets), after having been convicted of three or more violent felony or serious drug offenses, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). The indictment identified eight prior felony convictions: grand theft, attempted robbery, aggravated assault, two robberies, sale or delivery of cocaine, possession of cocaine, and sale of a substance in lieu of a controlled substance. Lyons moved to dismiss the indictment, arguing that the armed-career-criminal charge violated the Eighth Amendment's proscription of cruel and unusual punishment. The district court denied his motion. Lyons then filed a motion to suppress the four bullets found on his person during a search incident to his arrest for disorderly conduct. He argued that the seizure of the bullets was illegal because his conduct did not violate Florida's disorderly conduct statute, Fla. Stat. § 877.03. He maintained that the foregoing argument was supported by the fact that he had been acquitted on the § 877.03 charge in state court.

At an evidentiary hearing on the motion to suppress, the government presented the following evidence. Detective Brian Gederian of the Fort Myers Police

3

Department ("FMPD") testified that, during the early morning hours of September 16, 2001, he was patrolling an area containing a number of bars where "several fights" had occurred that evening. When he arrived, Detective Gederian approximated, 30 to 40 people were present at the scene. This was right around the closing time of the area bars. In the course of breaking up a developing fight, Detective Gederian arrested a friend of Lyons. According to Detective Gederian, after he had arrested Lyons's friend and placed the friend in the back of a patrol car, Lyons began "protesting about his friend's arrest" by "swearing and cussing." Lyons also directed racial epithets at Detective Gederian. Detective Gederian described Lyons's demeanor as "very aggressive," and indicated that he appeared intoxicated.

For security reasons, Detective Gederian asked Lyons to "step back about ten to fifteen times." Lyons failed to comply with these ten to fifteen requests and kept running toward Detective Gederian, approaching Gederian at a distance he estimated was not closer than "arm's length." At this point, Detective Gederian moved to arrest Lyons. When he was told that he was going to be arrested, Lyons took a "fighting stance," necessitating Gederian's use of pepper spray to subdue him. After Lyons's arrest, police officers found four Remington .22 caliber bullets in Lyons's front pocket.

FMPD Officer Jeffrey Paul Bernice, who was on patrol in the same area on the night of Lyons's arrest, assisted in the arrest of Lyons's friend. Officer Bernice testified that the friend was an Asian male who, it was reported, had slapped a white female. Officer Bernice testified that he had encountered Lyons prior to the evening of September 16, 2001, and that, in these situations, "Lyons was always respectful to me, courteous, kind, always friendly." However, on the evening of his arrest, Bernice described Lyons as "very upset" and "angry." According to Officer Bernice, after Lyons's friend was arrested, Lyons began "screaming obscenities," and gesturing by holding his hands up in the air. At some point, two bottles were thrown at law enforcement officers in the area, but the officers were unable to tell who threw the bottles. There were about five law enforcement officers at the scene of the arrest. Officer Bernice confirmed that Detective Gederian directed Lyons to leave, but that Lyons did not comply with this instruction. Officer Bernice testified that the crowd then consisted of over 100 people.

In support of his suppression motion, Lyons presented the testimony of a friend, Jana K. Minor, who had been at the scene of Lyons's arrest. Minor stated that she, Lyons, and Lyons's then-girlfriend went to a bar in downtown Fort Myers. Outside of the bar, Minor saw a woman named "Tracy" hit an Asian man, at which point, the man had to "restrain her [Tracy]. . . so she wouldn't hit him again." Minor

5

further testified that Tracy then falsely reported to law enforcement that the Asian man hit her. After the alleged false report, Minor saw the officers arrest the Asian man. Minor also observed that after a female friend protested the arrest, the police "thr[ew] her to the ground and put [her] in handcuffs." According to Minor, at this point Lyons called the officers "fucking honkeys" while he was walking away from the scene. The police officers then sprayed Lyons with mace and handcuffed him. According to Minor's account, Lyons swore at the police officers only once.

In a Report and Recommendation (R&R), the magistrate judge recommended denying the motion to suppress. The magistrate judge concluded that the police had probable cause to arrest Lyons for a violation of Florida law (disorderly conduct) based on the following facts: (1) "[a]t the time of Mr. Lyons's arrest, Detective Gederian was facing a large crowd of people" and was attempting to disperse the crowd; (2) Lyons yelled obscenities at the officers and was "running up to the officers," for a "reason [that] did not appear to be evident to Officer Detective Gederian"; and (3) bottles were thrown at the officers by unknown persons in the crowd. The magistrate judge denied Lyons's suppression motion, concluding that "Lyons's words along with his non-verbal actions interfered with Officer Detective Gederian's duty to disperse the crowd, and Officer Detective Gederian had probable cause for arresting Mr. Lyons pursuant to [Fla. Stat.] § 877.03."

Lyons objected to the R&R, arguing, inter alia, that under Florida law, his conduct did not constitute disorderly conduct because it consisted of "mere words." The district court disagreed, observing: (1) "the testimony established that a crowd of a couple hundred people were" assembled at the scene of Lyons's arrest; (2) when police officers arrested Lyons's friend after a fight, Lyons began "swearing and cussing"; (3) Lyons "would stand back for a moment, then run up in an aggressive manner while continuing to yell, scream, and use profanity the entire time"; and (4) Lyons "repeated this conduct between ten and fifteen times over a period of about ten minutes." Based upon these findings, the district court concluded that "the totality of the circumstances in this case establishes that defendant's conduct was more than mere protected speech and was sufficient for the officers to have probable cause to arrest under the Florida disorderly person statute." Accordingly, the district court denied Lyons's objections, adopted the R&R, and denied the motion to suppress.

At the start of Lyons's subsequent trial, the government moved in limine to prevent Lyons from introducing evidence of his state-court acquittal on the disorderly-conduct charges. The government argued that this information was irrelevant to Lyons's charged offense of possessing ammunition while a convicted felon. Lyons conceded this point, but maintained that the evidence was relevant to

show Detective Gederian's motive and bias. The district court disagreed and granted the government's motion.

At trial, Detective Gederian presented testimony that was, in all material respects, consistent with the testimony he provided at the suppression hearing. In addition, he testified that after he returned to the police station, Officer Sean Hoover gave him a "property envelope" containing the four bullets. Detective Gederian indicated that he placed the bullets into a plastic bag. He also identified the bullets for the jury. When he submitted the bullets for fingerprinting, about four months after Lyons's arrest, analysis of the bullets yielded no fingerprint evidence. Finally, Detective Gederian explained that he did not mention the bullets on the "booking sheet," which he completed shortly after Lyons's arrest, because Lyons was not facing federal charges at that point, and the bullets were irrelevant to the state charges that Lyons was facing.

During cross-examination, defense counsel showed Detective Gederian a transcript from Lyons's state trial. Detective Gederian admitted that, in this proceeding, he had not testified that Lyons assumed a "fighting stance" when informed of the arrest. Defense counsel then tried to ask Gederian about the charges and state trial, at which point the government objected, arguing that the information was not relevant to the federal charge. Defense counsel responded that he was trying

to establish Detective Gederian's "motivation for testifying." The district court sustained the government's objection.

FMPD Officer Sean Hoover transported Lyons to the police station after his arrest. Officer Hoover testified at trial that after arriving at the police station, he inventoried Lyons's property. Officer Hoover identified the property envelope in which he placed Lyons's possessions, which included, among other things, four .22-caliber bullets. Hoover said that he removed these bullets from Lyons's pocket on the night Lyons was arrested.

The jury returned a guilty verdict and Lyons proceeded to sentencing. The presentence investigation report ("PSI") indicated that, because Lyons had twice been convicted of a crime of violence, a base offense level of 24 applied. And because of his multiple prior convictions, Lyons was an "armed career criminal," within the meaning of 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4(a). Thus, based on a criminal history Category VI and a total offense level of 33, his sentencing range was 235 to 293 months' imprisonment.

Over Lyons's Eighth Amendment challenge to the constitutionality of § 4B1.4's "armed career criminal" provisions, the district court sentenced Lyons to a 235-month term of imprisonment, followed by a 3-year term of supervised release. This timely appeal followed.

Lyons first argues that the district court erred by denying his motion to suppress the bullets because the FMPD officers lacked probable cause to arrest him for violating Fla. Stat. § 877.03, and, thus, that there was no basis for searching him incident to a lawful arrest.  More specifically, Lyons says that, because his statements did not inflict injury or tend to incite an immediate breach of the peace, his behavior did not constitute disorderly conduct under Florida law.  We disagree.

"Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant[,] search a person validly arrested."  Michigan v. DeFillippo, 443 U.S. 31, 35, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979).  In turn, "the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense."  Id. at 36.  "For probable cause to exist, both federal and Florida law say that an arrest must be objectively reasonable based on the totality of the circumstances."  Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002).  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Id. (citation and internal quotation marks omitted).

"The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." DeFillippo, 443 U.S. at 36. Thus, the dispositive question in this case is whether, at the time Lyons was arrested, based on the totality of the facts and circumstances within Detective Gederian's knowledge, there was probable cause to believe Lyons had committed the crime of disorderly conduct. On this record, we conclude that probable cause existed.

Lyons was arrested for disorderly conduct in violation of Fla. Stat. § 877.03, which provides that

> [w]hoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

As a preliminary matter, we note that under Florida law, where the basis for an arrest under § 877.03 is speech only, the statute's application is limited:

> [W]e now limit the application of Section 877.03 so that it shall hereafter only apply either to words which 'by their very utterance . . . inflict injury or tend to incite an immediate breach of the peace,' White v. State, 330 So.2d at 7; see Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); or to words, known to be false, reporting some physical hazard in circumstances where such a report creates a clear and present danger of bodily harm to others. . . . With these two exceptions, Section 877.03 should not be read to

11

> proscribe <u>the use of language</u> in any fashion whatsoever. (Emphasis added).

<u>State v. Saunders</u>, 339 So.2d 641, 644 (Fla. 1976) (emphasis added). The limitation discussed in <u>Saunders</u> concerns arrests for <u>speech only</u>. Since Lyons's conduct did not consist of speech only, the limitation is not relevant to our analysis.

Based on our careful review of Florida law, it is equally clear that challenged <u>conduct</u> that involves something more than "mere speech" remains subject to § 877.03. <u>See</u>, <u>e.g.</u>, <u>C.L.B. v. State</u>, 689 So. 2d 1171, 1172 (Fla. Dist. Ct. App. 1997) (holding that defendant's nonverbal acts, which included repeatedly approaching police officer, in combination with his speech, violated § 877.03); <u>W.M. v. State</u>, 491 So. 2d 335, 336 (Fla. Dist. Ct. App. 1986) (finding that defendant's conduct during a traffic stop, which drew a large hostile crowd to the scene, constituted disorderly conduct); <u>Delaney v. State</u>, 489 So. 2d 891, 892 (Fla. Dist. Ct. App. 1986) (upholding probable cause to arrest and conviction under § 877.03 where "appellant's conduct consisted of more than his arguably 'protected' speech" and such conduct "precluded [the] [o]fficer . . . from investigating . . . by being loud and abusive, continually interrupting [the officer's] investigation . . . , and ignoring [the officer's] request to wait his turn.").

Here, given the totality of the circumstances facing the officers on the night of Lyons's arrest, we readily conclude that the facts and circumstances provided an adequate basis for Officer Gederian to reasonably believe that Lyons had committed or was about to commit a violation of § 877.03. In addition to his speech, which consisted of yelling obscenities and a racial epithet, Lyons engaged in non-verbal conduct, which Gederian reasonably perceived as "aggressive." This conduct included running up to Gederian multiple times while Gederian was trying to disperse a large crowd, amounting to no less than 30 or 40 and possibly exceeding 100 people. The magistrate judge found that Lyons's conduct interfered with the officers' dispersal attempts. Although Gederian repeatedly warned Lyons to leave the area between 10 and 15 times, Lyons refused to comply. It was a busy night in the "entertainment district," where the bars were located, and the police had come to the scene in response to reports of several fights that evening. Indeed, at some point during the officers' dispersal efforts, members of the crowd threw two bottles at the officers (although there is no indication Lyons threw anything at the officers). Again, there were only five officers at the scene compared to a crowd of at least 30 to over 100 people. Simply put, based on the presence of all these factors, which have been considered in various Florida disorderly conduct cases, Gederian reasonably could have believed that Lyons had committed or was about to commit a violation of §

13

877.03. Accordingly, we can discern no error in the district court's denial of Lyons's motion to suppress the bullets found during a search incident to his arrest.

We are likewise unpersuaded by Lyons's argument that the district court abused its discretion by granting the government's motion in limine to preclude him from introducing evidence that he had been acquitted of disorderly conduct in state court. Again, our review of this evidentiary ruling is for abuse of discretion. "The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." Frazier, 387 F.3d at 1259. Thus, we will affirm the district court even on "'occasions in which . . . we would have gone the other way had it been our call.'" Id. (quoting Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994)). When employing this standard, "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id. (citation omitted).

Lyons argues that evidence of his acquittal was relevant to show that Detective Gederian was biased against him and might have planted the bullets on him, and that the district court's ruling violated his Fifth and Sixth Amendment rights by precluding effective cross-examination of Detective Gederian. More specifically, Lyons argues that the district court's rulings prevented him from arguing that Detective Gederian was prejudiced against him because of his state court acquittal,

14

and that this motivated Detective Gederian to embellish his testimony in this case.[1]

"[T]he Sixth Amendment only protects cross-examination that is relevant." Jones v. Goodwin, 982 F.2d 464, 469 (11th Cir. 1993) (emphasis added); United States v. Novaton, 271 F.3d 968, 1006 (11th Cir. 2001) ("[A] defendant is only entitled to cross-examine a witness if the information sought to be elicited [is] relevant." (citation and internal quotation marks omitted)). Thus, a trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Francis v. Dugger, 908 F.2d 696, 702 (11th Cir. 1990) (citation and internal quotation marks omitted).

While "[c]ross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness," United States v. Phelps, 733 F. 2d 1464, 1472 (11th Cir. 1984) (citation omitted), "the mere fact that [a defendant] sought to explore bias on the part of a prosecution witness does not

---

[1] Lyons says that he wanted to cross-examine Gederian on whether he had "planted" the bullets in retaliation for Lyons's acquittal on the underlying disorderly conduct charges. As Lyons concedes in the reply brief, however, the date on which Detective Gederian claimed to find the bullets preceded the date of the state court acquittal. Therefore, the acquittal itself could not have motivated Detective Gederian to plant evidence on Lyons.

automatically void the court's ability to limit cross-examination." United States v. Diaz, 26 F.3d 1533, 1540 (11th Cir. 1994). The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Of course, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; cf. Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., --- F.3d ----, 2005 WL 552483 (11th Cir. Mar. 10, 2005) (excluding evidence of other crimes, wrongs, or acts where "any probative value the [evidence] might have was substantially outweighed by [its] potential to mislead the jury and prejudice the defendant").

At the trial, the government pointed out that evidence of Lyons's state court acquittal was irrelevant to whether or not he violated § 922(g). Indeed, the elements of a § 922(g) charge plainly differ from those that support a violation of § 877.03. Defense counsel noted that the evidence "isn't relevant as to whether or not he possessed the ammunition," but argued that it was "relevant to the motive and bias" of Detective Gederian -- Lyons wanted to impeach Detective Gederian by arguing

that "he must now justify" Lyons's arrest. In short, the relevance, if any, of Lyons's acquittal in state court was exceedingly marginal and, given that it may have confused the jury, we can find no abuse of discretion in the district court's decision to exclude this evidence.

Finally, Lyons argues his 235-month sentence constitutes cruel and unusual punishment, in violation of the Eighth Amendment. "The Eighth Amendment, which forbids cruel and unusual punishments, contains a <u>narrow</u> proportionality principle that applies to noncapital sentences." <u>Ewing v. California</u>, 538 U.S. 11, 20, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (emphasis added) (citations and internal quotation marks omitted); <u>United States v. Brant</u>, 62 F.3d 367, 368 (11th Cir. 1995) ("In non-capital cases, the Eighth Amendment encompasses, at most, only a narrow proportionality principle."). Moreover, "[r]ecidivism has long been recognized as a legitimate basis for increased punishment." <u>Ewing</u>, 538 U.S. at 25.

Indeed, the Supreme Court has consistently affirmed the imposition of longer sentences, even for non-violent offenses, based on an offender's recidivism. <u>See</u> <u>Ewing</u>, 538 U.S. at 30-31 (affirming a 25-year to life sentence given to recidivist who stole 3 golf clubs priced at $399 each); <u>Hutto v. Davis</u>, 454 U.S. 370, 374-75, 102 S. Ct. 703, 70 L. Ed.2d 556 (1982) (affirming two consecutive sentences of 20 years each given to recidivist for possessing 9 ounces of marijuana with the intent to

17

distribute it and for distribution of marijuana); <u>Rummel v. Estelle</u>, 445 U.S. 263, 265, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (affirming life sentence with the possibility of parole imposed upon recidivist who "obtain[ed] $120.75 by false pretenses").

The provisions of 18 U.S.C. § 924(e) require imposition of "not less than 15 years" imprisonment upon "armed career criminal[s]," which the statute defines as any person who violates § 922(g) after having been convicted of three or more violent felonies or "serious drug offense[s.]" 18 U.S.C. § 922(g). Accordingly, U.S.S.G. § 4B1.4(b) provides that a defendant's total offense level must be increased to at least 33 when the defendant is an "armed career criminal." <u>See</u> U.S.S.G. § 4B1.4(b).[2]

In the instant case, Lyons's category VI criminal history and the heightened total offense level required by § 4B1.4(b) resulted in a guidelines sentencing range of 235 to 293 months. <u>See</u> U.S.S.G. § 5A. This sentence was entirely the result of Lyons's recidivism. In fact, because § 922(g)(1) only applies to individuals with predicate convictions, Lyons could not have been convicted in the first place had he not previously been convicted of a crime punishable by more than one year of imprisonment. <u>See</u> 18 U.S.C. § 922(g)(1). Again, Lyons was previously convicted

---

[2] Section 4B1.4(c) of the Sentencing Guidelines provides that a finding that a defendant is an armed career criminal may, under certain circumstances, increase the criminal history category that applies. However, because Lyons had a category VI criminal history even before this provision was applied, he was not affected by § 4B1.4(c).

of grand theft, attempted armed robbery, two counts of robbery without a weapon, battery, sale of cocaine, sale of a substance in lieu of a controlled substance, and an additional count of sale of a controlled substance. The length of his sentence was the result of his extensive criminal history and it is well-settled law that a longer sentence may be imposed on a recidivist, based on his criminal history, even if the offense of conviction is relatively minor in nature. In short, under controlling Supreme Court precedent, we can find no Eighth Amendment violation in this case.

**AFFIRMED.**