UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony Theodore SONNTAG,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Dana Conrad NICHOLSON, Jr.,
Defendant-Appellant.

Nos. 81–5502, 81–5558.

United States Court of Appeals,
Eleventh Circuit.

Sept. 1, 1982.

Robert S. Griscti, Larry G. Turner, Gainesville, Fla., for defendant-appellant Sonntag.

John E. Lund, Tampa, Fla., for defendant-appellant Nicholson.

Stephen S. Cowen, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before TUTTLE, KRAVITCH and HENDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

In this consolidated appeal Anthony Sonntag and Dana Nicholson contend that they were improperly convicted of possession with intent to distribute and conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. They raise a variety of claims of error, including the failure to suppress certain evidence seized at Nicholson's home and from Sonntag's wallet, the trial court's instructions on the entrapment defense, various discretionary rulings by the court on evidentiary matters and the conduct of trial, and insufficient evidence to sustain the conviction. Finding these claims without merit, we affirm.

I.

The government's evidence at trial showed that in September of 1980, Richard Clegg, a past informant for the Drug Enforcement Administration, set out to locate a source of drugs, hoping to turn the information over to the DEA and earn an informant's fee. Clegg testified that in mid-September, he met Dana Nicholson who sold him some barbiturate pills and marijuana. Clegg mentioned to Nicholson that he represented buyers who were interested in purchasing large quantities of cocaine, and Nicholson responded that he could supply it. Clegg then met with DEA agents Thomas South and Dorothy Wehrly, informed them of his contact with Nicholson and agreed to a $2500 fee for his work on the case. Subsequently Clegg told Nicholson that "his people" wanted to purchase "three keys" (three kilograms) of cocaine. Nicholson replied that he would contact his source in the Washington, D. C. area. At a later meeting Nicholson told Clegg he could supply the cocaine, and Clegg arranged a meeting with DEA agents South and Wehrly.

At this meeting in mid-November, South told Nicholson that he was interested in purchasing 2–3 kilos of cocaine on a regular basis. Nicholson again confirmed that he had a source in Washington, D. C., and after some discussion of price the meeting ended. Clegg accompanied Nicholson to Nicholson's home, where Nicholson phoned "his people up North." Clegg heard Nicholson greet "Tony" and ask about "three keys." Telephone records indicated that the call was to Anthony Sonntag in Lovettsville, Virginia, an area outside of Washington, D. C.

Nicholson and Clegg met again with Agents South and Wehrly on November 24. Nicholson told Agent South that everything was ready in Ft. Lauderdale, that he could obtain a kilo of cocaine without Agent South having to show any money beforehand, and that he would bring the kilo to Tampa and sell it to Agent South. Nicholson further stated that after the one-kilo transaction had taken place, Nicholson would go back down and pick up two additional kilos. Nicholson related that "Tony," from "New Jersey," was on the way down that evening. Nicholson said that the actual price for the kilo would be within $1000 or $2000 of a $50,000 per kilo price. Agent South stated that he wanted Clegg to see the cocaine first before any exchange took place. Nicholson responded that he and "Tony" would go with Clegg to pick up the kilo in Miami. This meeting ended about 6:00 p.m., with Nicholson telling Clegg to telephone him later that evening.

Pursuant to this instruction, Clegg telephoned Nicholson that evening. Nicholson said that his connection from up North was with him, and arranged to meet Clegg at a bar. At the bar, Nicholson introduced Sonntag to Clegg as "Tony." Clegg told Sonntag that Sonntag would make a lot of money by moving cocaine, and that Clegg had a number of buyers for whom he acted as middleman. Sonntag stated that he was "ready to do business" with Clegg, and that he had a sample of the "merchandise" Clegg would be able to get by going with Sonntag to Miami. Sonntag and Nicholson

then took Clegg outside to Nicholson's van, and Sonntag showed Clegg a lump of cocaine. Sonntag stated that the quality of this cocaine was very good and that this would probably be the same merchandise they could buy in Miami. They suggested that Clegg leave with them for Miami at 7 or 8 o'clock the next morning, so that Clegg could judge the quality of the cocaine himself.

En route to Miami, Sonntag and Nicholson advised Clegg that he was to take an airplane back to Tampa after he saw the cocaine, and they would drive the merchandise back. Near Miami, Sonntag stated that if Clegg were not satisfied with the first sample he looked at, Sonntag had another source in Miami they could go to. Sonntag mentioned the name "Louie" or "Louis" as a source. A later search of Sonntag's wallet after his arrest revealed two slips of paper, one with the name "Louis" opposite a Miami telephone number and the other with the same number.

In Miami Sonntag left Clegg at a Ramada Inn. Sonntag said he would pick up a sample of the cocaine while Clegg and Nicholson waited at the hotel. Sonntag returned shortly with a sample for Clegg's approval. Nicholson then made a plane reservation for Clegg to return to Tampa. Late that night, Agent South met Clegg at the Tampa Airport. Clegg then telephoned Nicholson's house, speaking first with Sonntag and then with Nicholson. They had just returned from Miami. Nicholson stated they wanted to close the deal that night because Sonntag had a flight the next day to return home for Thanksgiving. During this call, Nicholson said the price would be $58,000 for one kilo. Clegg then telephoned Agent South, who said it was impossible to complete the deal that night, as sufficient police back-up could not be arranged at that late hour. Clegg telephoned Nicholson again and told him that the deal could not be completed that night, and that they would do it in the morning. Telephone toll records for Nicholson's house show that at 12:12 a.m. that night, a call was made to the Miami telephone number of "Louis."

On the morning of November 26, Clegg again called Nicholson at his home and told him he had not yet heard from his people. Clegg said he would call Nicholson back to arrange for the transaction, but did not do so. Rather, Agents South and Wehrly picked up Clegg and proceeded to Nicholson's house. When they arrived, Nicholson was standing outside of his front lawn, near the curb. Clegg and Agent Wehrly exited the car and greeted Nicholson. They then walked up to Nicholson's front door and rang the doorbell. Nicholson, in the meantime, entered Agent South's car, and expressed concern that he had seen vehicles in the area which he suspected were police cars. Agent South offered to show the money to Nicholson, but Nicholson responded "there will be time for that, the package is in the house, let's go." Nicholson asked Agent South to circle the block. As they did so, Nicholson became alarmed over two unmarked cars with radio antennas, which he believed were police cars (and which in fact were back-up surveillance units). As Agent South drove back toward Nicholson's house, Nicholson directed him to drive on to a telephone so Nicholson could call the house and "tell them to hold up until things cool off." Agent South complied, and drove Nicholson to a phone booth. As Nicholson began dialing, Agent South arrested him.

While Nicholson was with Agent South, Clegg and Agent Wehrly were at the house. After Clegg rang the doorbell Sonntag let them inside. Clegg introduced Agent Wehrly as Agent South's girlfriend who was to take a look at the merchandise before the purchase would be made. Clegg further stated that Agent Wehrly would be carrying the cocaine. Sonntag led Clegg and Wehrly into the kitchen area, removed a towel covering a plastic bag of cocaine placed on a triple-beam balance scale and handed the bag to Clegg. Set out on the dining room table was a round mirror and razor blade. Clegg used the mirror and blade to crush a little bit of the cocaine from the package handed to him by Sonntag. Clegg noted that it was very oily, and stated to Agent Wehrly that it looked like the same merchandise he had seen the day

before. Sonntag responded by saying that "yes, it's very good; it's the same merchandise you saw yesterday." At this point, Agent Wehrly arrested Sonntag. Laboratory analysis determined that the substance in the plastic bag was 66 percent pure cocaine, with a net weight of 943.7 grams.

Sonntag did not testify at trial. Nicholson did testify, and claimed that both he and Sonntag had been entrapped by Clegg. Nicholson denied ever selling, or offering to sell, marijuana or cocaine to Clegg at Nicholson's house, or elsewhere. Rather, Nicholson claimed that Clegg promised to pay him $1500 for pretending to be a middleman with a source of cocaine so that Clegg could impress a drug buyer from Detroit. This charade, according to Nicholson, was to help Clegg avoid having his buyer bypass Clegg to deal directly with Clegg's real source of cocaine. Nicholson claimed he play-acted this middleman role during the meetings with Agents South and Wehrly.

Nicholson testified that he had known Tony Sonntag for 13 years, and that Sonntag was coming to Florida to look at real estate. After Sonntag arrived in St. Petersburg, Nicholson introduced Sonntag to Clegg. The purpose of this meeting with Clegg was simply to talk about collecting the $1500 Clegg owed Nicholson for the role-playing.

According to Nicholson's testimony, Clegg asked Sonntag if he knew a source of drugs, and Sonntag indicated there was a possibility. Clegg allegedly said he knew cocaine was available in Miami, and since he lacked an automobile, he wanted Nicholson and Sonntag to go with him to Miami. Once in Miami, according to Nicholson, Clegg told Sonntag to contact Sonntag's sources while Clegg would contact Clegg's sources. Nicholson claimed that after Sonntag returned to the motel with the cocaine, Clegg told Nicholson to make a plane reservation for Clegg in a phony name. Nicholson testified that Sonntag was not a drug dealer, and that he had not

informed Sonntag of the meetings he had had with Agents South and Wehrly.

On cross-examination, Nicholson did not deny that he had telephoned Sonntag after the meeting on November 18, but instead contended that the reference to "three keys" concerned keys to Nicholson's car, not three kilograms of cocaine. He acknowledged using cocaine twice, and having marijuana at his house for personal use. He contended that the triple-beam balance scale found at his house had been purchased by him at Clegg's direction, though Nicholson had to advance the $45 for the purchase and kept the scale at his own house. Nicholson also disputed several other aspects of Clegg's story. The jury, however, rejected the entrapment defense and convicted both men of the charges against them.

## II.

■ Appellants make two separate claims concerning the suppression of certain evidence admitted at trial. The first claim is that the evidence seized in Nicholson's house [1] after Sonntag's arrest should have been suppressed because the DEA agents failed to obtain an arrest or search warrant despite ample opportunity to do so. In *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), however, the Supreme Court held under a theory of consent search that evidence seized without a warrant by law enforcement agents who had entered the defendant's home to complete a drug transaction was admissible and that the seizure did not violate the defendant's fourth amendment rights.

Appellants argue that *Lewis* is distinguishable because the Supreme Court emphasized that the defendant had invited the undercover agent into the home for the express purpose of completing a drug transaction, thus making the home a place of business. Here, appellants argue, Nicholson had told Clegg that he did not want the deal to take place at his house, yet the DEA "orchestrated" events to force the sale to

---

1. This evidence included the cocaine, the scale, the mirror, the razor blade, and a piece of paper which government witnesses testified was a "bill" for the cocaine.

take place at the house.[2] The undisputed evidence, however, shows that on the morning of November 26, neither Sonntag nor Nicholson objected to the transaction occurring at Nicholson's home, that Nicholson was aware that under the circumstances the sale would be consummated inside the house, and that Sonntag invited Clegg and Agent Wehrly into the Nicholson house for the express purpose of completing the drug sale.[3] Accordingly, we find *Lewis* controlling.

■ Appellants' second claim is that evidence of the phone numbers for "Louis" and a packet of cocaine seized from Sonntag's wallet should have been suppressed because the search took place after Sonntag had been transported to Tampa for booking and was therefore not a valid search incident to arrest.[4] In *United States v. Baldwin*, 644 F.2d 381, 384 (5th Cir. 1981), the former Fifth Circuit held that a search of a defendant's wallet which occurred several hours after arrest and after the defendant had been transported for booking was a valid search incident to arrest. This decision is binding on us, *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) and is controlling. *See also United States v. Ziller*, 623 F.2d 562, 563 (9th Cir.), *cert. denied*, 449 U.S. 877, 101 S.Ct. 221, 66 L.Ed.2d 99 (1980) (search of defendant's wallet after transportation to federal building upheld as search incident to arrest).

2. Appellants argue, for example, that Clegg never called Nicholson back the morning of the drug transaction, as Clegg had agreed to do, but rather the informant and the DEA agents merely showed up at Nicholson's home to prevent arranging the transaction elsewhere.

3. Appellants assert that because Sonntag was not the owner of the house, the *Lewis* rationale of owner consent to a drug "business" deal is inapplicable. It is well-settled, however, that third parties may give effective consent to search premises of another. *See, e.g., United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981); *United States v. Block*, 590 F.2d 535, 539–40 (4th Cir. 1978); *United States v. Jones*, 580 F.2d 785, 787 (5th Cir.

## III.

Appellants' next complaint concerns the entrapment instruction given by the trial court. The court charged the jury as follows:

■ Each Defendant asserts that he was a victim of entrapment as to the offenses charged in the indictment.

■ Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers, their agents, or their informers to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

■ On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that Government agents or informers provide what appears to be favorable opportunity is not entrapment. For example, it is not entrapment for a Government agent or informer to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction.

■ Law enforcement officials are not precluded from utilizing artifice, stealth and strategem in order to apprehend persons engaged in criminal activities, provided that they merely afford opportunities or facilities for the commission of the offense by one predisposed to commit it. I charge you that the mere fact that the

1978); *Moffet v. Wainwright*, 512 F.2d 496, 499 (5th Cir. 1976). *Matlock* teaches that such consent must come from someone "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171, 94 S.Ct. at 993. Our review of the record leaves no doubt that Sonntag had the authority to admit Clegg and Agent Wehrly to Nicholson's house to complete the drug deal. Accordingly, we reject the distinction drawn by appellants.

4. The district court ruled that the search was a valid inventory search; and appellants have contested this finding on appeal. Because we find that under the controlling authority of *United States v. Baldwin*, 644 F.2d 381, 384 (5th Cir. 1981) the search was a valid search incident to arrest, we need not address the inventory search issue.

Government may have solicited a Defendant to sell cocaine in this case does not constitute entrapment if that Defendant were otherwise predisposed to violate the law. Such activity by Government agents or informers is proper under the law.

■ If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the Defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that Government officers or their agents did no more than offer the opportunity, then the jury should find that the Defendant is not a victim of entrapment.

■ On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the Defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer, agent, or informant of the Government, then it is your duty to find him not guilty.

■ There may be entrapment even though the person implanting the illegal purpose in the Defendant's mind is an ignorant pawn of the Government. There need not be direct contact between the Government and the Defendant. Rather, the Government is fairly charged with responsibility for its actions when it has an established relationship with an unknowing private party and if that private party implants in the mind of the Defendant the disposition to commit the alleged offense.

■ Appellants make two separate arguments concerning this charge. First, they claim that the charge is deficient because it fails to unequivocally state that the government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. This claim is now foreclosed by this court's recent decision in *United States v. Vadino*, 680 F.2d 1329, 1337–38

(11th Cir. 1982), which held that an entrapment charge almost identical to the one given here was sufficient despite its failure to specifically mention the burden of proof on entrapment. While we agree with the *Vadino* court that better practice would be to include such an instruction, where the court has given a general instruction on the burden of proof and told the jury to consider the charge as a whole,[5] the absence of a specific burden of proof instruction on entrapment is not reversible error.

■ Appellants' second argument is that paragraph four of the instruction improperly invaded the fact-finding function of the jury by prohibiting the jury from considering whether certain conduct was entrapment. This argument is meritless. Paragraph four of the charge did no more than inform the jury that merely providing the opportunities or facilities for the commission of a crime is not entrapment. This is a correct statement of the law, *see United States v. Bagnell*, 679 F.2d 826, 834 (11th Cir. 1982); *United States v. Humphrey*, 670 F.2d 153, 156 (11th Cir. 1982); *United States v. Hill*, 626 F.2d 1301 (5th Cir. 1980), and did not invade the proper function of the jury.

### IV.

Appellants' next arguments concern several rulings by the trial court pertaining to the admission of evidence and conduct of trial. Appellants claim that these rulings were individually erroneous and when considered as a whole indicated a bias by the judge which denied them a fair trial. We disagree.

■ The first ruling complained of was the trial court's admission of evidence pertaining to Nicholson's sale of barbituate pills, marijuana and a cocaine sample to Clegg. Appellants contend that the government's failure to disclose its intent to use this evidence in accordance with a discovery order requiring disclosure of "similar acts" evidence under Fed.R.Evid. 404(b) rendered admission of the evidence reversi-

---

**5.** The district judge gave such instructions    here.

ble error. This argument is incorrect. The evidence was offered to prove predisposition of Nicholson after he had raised the entrapment defense. The evidence, therefore, was admissible under Rule 404(a)(1) as evidence of a pertinent character trait of the accused and was not within the discovery order's command to disclose "prior acts probative of knowledge or intent," a Rule 404(b) category. Moreover, even if lack of disclosure was error, the error is not reversible unless it has prejudiced the substantial rights of the accused through unfair surprise which hinders preparation for the defense or by "substantially influencing" the jury. *United States v. Gonzales*, 661 F.2d 488, 494 (5th Cir. Unit B 1981); *United States v. Ible*, 630 F.2d 389, 396 (5th Cir. 1980). The defense was aware of these facts at least a month prior to trial as a result of taking Clegg's deposition, and the government had indicated on the discovery form that it "might" use such evidence. The defense, therefore, can hardly claim unfair surprise. Additionally, the trial court ruled in chambers prior to trial (before predisposition was an issue) that only the sale of pills and first sale of marijuana would come within the "similar acts" category; the remaining marijuana sales and sale of the cocaine sample were admissible as part of the res gestae of the conspiracy.[6] *See* Transcript of Trial Proceedings, Vol. I at 25. Thus even if the government erred in not disclosing these first two sales, the evidence was cumulative of the subsequent sales which would have been admissible in any event; hence we conclude these first two sales did not "substantially influence" the jury.

■ The second ruling appellants claim was error was the trial court's admission of evidence in the government's rebuttal case that shortly before the cocaine deal at issue here, Sonntag had purchased a $16,000 Corvette without financing. This evidence, however, was proper rebuttal both of de-

fense evidence that Sonntag did not live the ostentatious style of a drug dealer and of Nicholson's testimony that he never told Clegg that his "source" had recently purchased a Corvette.

■ Appellants' remaining claims require little discussion. Appellants raise issues concerning trial court rulings under Fed.R.Evid. 403; these rulings are discretionary with the trial court, *see United States v. Thevis*, 665 F.2d 616, 634 (5th Cir. Unit B 1982), and our review of the record reveals no abuse. Appellants also claim that the court improperly limited cross-examination of Clegg; as long as the limitation does not interfere with the defendant's right of confrontation, this ruling is also discretionary with the trial court. *United States v. Tolliver*, 665 F.2d 1005, 1008 (11th Cir. 1982). Here, the trial court permitted thorough cross-examination of Clegg which revealed that the informant was a habitual drug user and heavy drinker, had avoided prison terms by cooperating with the DEA in the past, and was a paid informant. This cross-examination satisfied the strictures of the sixth amendment, *see Tolliver, supra*, and the prohibited questions were either irrelevant or repetitive. No abuse of discretion occurred. Finally, appellants claim that the prosecutor engaged in improper closing argument. We have reviewed the transcript of closing argument and found nothing improper.

## V.

■ The final point on appeal is Nicholson's claim that the evidence was insufficient to support a finding of predisposition beyond a reasonable doubt. Nicholson concedes that Clegg's testimony, if credible, would support the conviction, but asserts that Clegg was so thoroughly discredited that no reasonable juror could have accepted his testimony. The ironclad rule of law established by Supreme Court precedent,

6. The former Fifth Circuit on many occasions has acknowledged that an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an "extrinsic" offense within Rule 404(b). *E.g.,*

*Gonzales, supra*, 661 F.2d at 493; *United States v. Kloock*, 652 F.2d 492, 494 (5th Cir. 1981); *United States v. Killian*, 639 F.2d 206, 211 (5th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

numerous decisions of this court, and hundreds of binding decisions of the former Fifth Circuit, however, is that an appellate court in reviewing the sufficiency of the evidence must view the evidence in the light most favorable to the government, including making all credibility choices which support the verdict. *E.g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982); *United States v. Mitchell*, 666 F.2d 1385, 1388 (11th Cir. 1982); *United States v. Cardona*, 650 F.2d 54, 57 (5th Cir. 1981); *United States v. Yanes*, 628 F.2d 294, 295 (5th Cir. 1980). For the purposes of this appeal, therefore, we must assume that despite the impeachment of Clegg, the jury believed him.

AFFIRMED.