[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15310
_____

D.C. Docket No. 0:17-cr-60015-FAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HALIMA OUEDRAOGO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 12, 2020)

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

Halima Ouedraogo appeals the denial of her motion to suppress evidence seized from her purse and hotel room upon her arrest for identity fraud and the denial of her motion to suppress the post-*Miranda* statements she made to police officers after they refused to give her blood pressure medication.  Ouedraogo also challenges the district court's admission of her pre-*Miranda* statements at trial by asserting that her trial counsel did not open the door for the government to admit them.  Finally, Ouedraogo appeals the addition of a guidelines enhancement to her sentence for using a sophisticated means to commit identity fraud.  After review, we affirm.

## I.    Background

A grand jury indicted Ouedraogo for using unauthorized access devices with the intent to defraud, 18 U.S.C. § 1029(a)(2) (Count 1), aggravated identity theft, 18 U.S.C. § 1028A(a)(1) (Counts 2, 4–12), and possessing 15 or more unauthorized access devices, 18 U.S.C. § 1029(a)(3) (Count 3).  Prior to trial, Ouedraogo moved to suppress several categories of evidence, including: (1) statements she made prior to receiving her *Miranda* rights where she lied about her identity and relationship to one of the victims, (2) statements she made after receiving her *Miranda* rights following the denial of her requests for blood pressure medicine, (3) a notebook found in her purse that the officers seized while arresting her which contained numerous items containing stolen personally

2

identifiable information ("PII"), and (4) the luggage seized from her hotel room after her arrest.

The district court held a hearing on Ouedraogo's motion.[1]  At the hearing, four witnesses testified as follows.  Detective Goldsworthy of the Fort Lauderdale Police Department testified that he was called to the Embassy Suites regarding an individual who had recently vacated her room, without paying, following a stay of several days.  Upon arrival, the hotel staff showed him unpaid invoices from the hotel room, a photo of Ouedraogo (which they had sent to other Hilton hotels in the area), and several pieces of paper from her vacated room that contained PII.  Goldsworthy and two Fort Lauderdale police officers—Officer Cavalier and Officer Kuras—then left the Embassy Suites and headed to the Hilton Marina, another Hilton hotel in the area that Ouedraogo had reportedly checked into that morning.  At the Hilton Marina, Goldsworthy spoke with Murphy, a Hilton Marina security guard, who informed him that Ouedraogo had checked into the hotel under a Hilton Honors account under a name that did not match hers ("J.B.").  While Goldsworthy was speaking with Murphy, Ouedraogo walked into the hotel lobby; Murphy pointed her out, and Goldsworthy approached her.  While the other officers were speaking with Ouedraogo, Goldsworthy called the real J.B. and

---

[1] At the hearing, the government represented that they did not intend to introduce Ouedraogo's statements made before she was given her *Miranda* warnings, and so that issue was not litigated or ruled on by the court at the time.

confirmed that J.B. did not know Ouedraogo.  J.B. also told Goldsworthy that she

did not have a Hilton Honors account and had recently had her identity stolen.

Goldsworthy then arrested Ouedraogo and conducted a search of her person,

including the purse she was holding, as part of his normal procedure after an

arrest.[2]  Inside Ouedraogo's purse, Goldsworthy found a small amount of

narcotics, twenty hotel key cards from different Hilton hotels, a Hilton wireless

card and code for a Hilton Honors room (matching the number of the Hilton

Marina room Ouedraogo was staying in), four credit cards with names that did not

match Ouedraogo's, four cell phones, and a lined notebook.

Goldsworthy did a "quick flip" through the pages of the notebook and

noticed several names that stood out to him, including J.B.'s.  The page with J.B.'s

name on it also listed her date of birth, Social Security number, address, and her

mother's maiden name.  He spent only fifteen seconds looking through the

notebook in search of contraband and evidence.

Goldsworthy then went with Murphy to Ouedraogo's hotel room because

Ouedraogo had informed him that someone else was still inside.  Murphy unlocked

the hotel room, and then the police entered.  Goldsworthy observed clothing, a

computer, an open binder, a suitcase, and several papers around the room.  He

---

[2] Goldsworthy testified later in the hearing that the hotel security officer, Murphy, informed Ouedraogo that she was trespassing and was no longer welcome on the property just before the officers arrested her.

observed that the open binder revealed several names, Social Security numbers, and credit card numbers in plain view.  Goldsworthy put all the items he found in the purse and in the hotel room into evidence.  He later obtained search warrants for the cell phones.

Meanwhile, Ouedraogo was taken to the Fort Lauderdale police station and brought into an interview room.  When Goldsworthy and another Fort Lauderdale detective, Detective Hoffer, entered the room, but prior to reading Ouedraogo her *Miranda* rights, Ouedraogo asked for blood pressure medicine.  Goldsworthy gave her the "standard response": he could not give her medicine or allow her to take medicine.  Ouedraogo responded by asking Goldsworthy "Are you trying to kill me?" and "Do you want me to die?"  Ouedraogo repeated her request for medicine several times.  Goldsworthy then asked if she needed medical assistance.  When she  indicated she did, Hoffer stepped out and called Fire Rescue.  It took "about 90 seconds" for Ouedraogo to request assistance, Hoffer to step out and call, and for him to come in and inform her that Fire Rescue was on the way.

After calling for medical assistance, the detectives reviewed Ouedraogo's *Miranda* rights with her using the standard Fort Lauderdale Police Department rights waiver form.  Ouedraogo signed the waiver, acknowledging that she understood her rights, that no promises or threats had been made to her, and that she was willing to answer questions without an attorney present.  Ouedraogo asked

Goldsworthy at one point for legal advice regarding the *Miranda* waiver, and he informed her that he could not give her any. After she signed the waiver, the detectives then moved to the substantive portion of the interview. At no point did Ouedraogo state that she did not want to speak with them. Goldsworthy stated that Ouedraogo appeared coherent the entire interview, she never stated that she did not wish to speak with them, and he did not make the threat that she would not receive treatment unless she spoke with them. Fire Rescue arrived and Ouedraogo initially refused to go to the hospital, but she was required to be medically cleared before taken to jail.

Officer Cavalier, who had accompanied Goldsworthy to the Hilton Marina, testified that he transported Ouedraogo to the police station for her interview and did not remember her complaining about her medical condition or showing signs of distress.

The two Fire Rescue paramedics who were dispatched to Fort Lauderdale Police Department on the day of Ouedraogo's arrest testified that they took her blood pressure a total of three times, and the readings showed that her blood pressure level was above average and rose to "a little on the high side." Ouedraogo expressed symptoms of lightheadedness and dizziness, but other than the slightly high blood pressure, Ouedraogo did not manifest any physical issues and appeared "normal." One of the paramedics testified that he believed that her

6

blood pressure was rising because Ouedraogo had not taken her medicine for hypertension, or high blood pressure.[3]

At the conclusion of the hearing, the district court orally denied Ouedraogo's motion to suppress her post-*Miranda* statements. The court found that her requests for medicine did not make her waiver involuntary because there was no evidence that the police indicated she could not get her medicine unless she spoke with them. After the suppression hearing, the district court denied in a written order the balance of Ouedraogo's motion to suppress. The court found that the notebook in her purse was properly searched incident to Ouedraogo's arrest. Regarding the items found in Ouedraogo's hotel room, the court found that she had no reasonable expectation of privacy in the hotel room because, by the time Ouedraogo was arrested, Hilton personnel had explicitly evicted her and provided a verbal trespassing warning for her fraudulent use of J.B.'s information. Therefore, the court found that she did not have standing to contest the search.

Ouedraogo proceeded to trial. During the trial, the government questioned Murphy, the hotel security officer, about speaking with Goldsworthy and observing Ouedraogo walk into the lobby. Murphy testified that when he pointed out Ouedraogo to Goldsworthy, the detective "motioned to her and asked, 'hey can

---

[3] According to the paramedic, high blood pressure could have complications that may result in death, but it would have to be "much higher" than what Ouedraogo experienced.

7

we talk to you for a minute?'"  According to Murphy, Ouedraogo "kinda stopped in her tracks, kind of looked for a second and then continued to walk."

During cross-examination, Ouedraogo's counsel addressed Murphy's testimony about the initial meeting of Ouedraogo and Goldsworthy: "You mentioned that Ms. Ouedraogo stopped in her track and then walked. To clarify, you meant walk towards you, is that correct?"  Separately, a few minutes later, defense counsel asked "When she was asked her name [by the officers], to the best of your recollection, she provided it, correct?" and "She answered the questions that you and the officers had, correct?"  Murphy responded affirmatively to these questions.

On re-direct, the government returned to the defense's questions concerning Ouedraogo's interaction with the officers at the hotel.  Over objection, the government asked Murphy whether Ouedraogo "introduce[d] herself . . . as a different name" before Ouedraogo said that her name was Halima Ouedraogo. Murphy replied affirmatively and stated that she first introduced herself as J.B. The government then asked if Ouedraogo had "made any statements regarding her relationship" with J.B., and Murphy confirmed that Ouedraogo had said that J.B. was her aunt.

The jury found Ouedraogo guilty on all counts.  In the presentence investigation report ("PSI"), two levels were added to Ouedraogo's offense

conduct for an offense involving sophisticated means, § 2B1.l(b)(10)(C). Thus, Ouedraogo's total offense level was calculated at 24. Based on an offense level of 24 and a criminal history category of II, the PSI determined that Ouedraogo's advisory guideline range was 57 to 71 months' imprisonment, with 2 years to run consecutively for each of the remaining counts (Counts 2 and 4–12). In the PSI addendum, the probation officer noted that the enhancement was warranted due to the fact that Ouedraogo (1) possessed 1,500 pieces of PII from the Florida State Corporation Credit Card Transaction list, (2) carried several access cards from multiple hotels gained through the use of aliases to avoid detection, and (3) used the identities of real individuals to create hotel guests accounts.

Ouedraogo objected, in relevant part, to the PSI's determination that she was eligible for the sophisticated means enhancement. She argued that the facts serving as the basis for that determination—her use of shell companies, credit repair fraud, and a PayPal card reader—were not proved as things that she used to further the fraud. As well, she argued that her stealing of identities was not, by itself, sophisticated and there was nothing about her case that demonstrated she acted in an especially complex or intricate manner. Lastly, Ouedraogo argued at sentencing that the approximately 1,500 pieces of PII was not an unusually high number for an identity theft crime.

9

The court disagreed.  It found Ouedraogo's case sufficiently sophisticated to warrant the enhancement and overruled her objection.  The court reasoned as followed:

> See, this is what I think about this case: This was sophisticated.  This was especially intricate.  The thing is the loss amount and what she gained by it is not like some other fraud cases, but it was a pretty sophisticated thing, especially by someone who has committed fraud before.
> …
> That's because she knew how the Hilton chain worked.  See, that's what's sophisticated.  I certainly couldn't do that. . . .  But she knew what she was doing, that she would go from one hotel to another, and when you look at the prior record, it shows that she's learned how to do different things that have to do with fraud.  That's what I see here, though, see.  We're not talking about someone who just doesn't know what's going on.

The court then adopted the PSI's sentence calculation and found her guideline range to be 57 to 71 months for Counts 1 and 3, with 2 years' consecutive imprisonment for Counts 2 and 4–12.  The court sentenced Ouedraogo to 71 months' imprisonment for Counts 1 and 3 to run concurrently, 24 months each for Counts 2, 4, and 5 to run consecutively, and 24 months for the remaining Counts to run concurrently, totaling 143 months' imprisonment.  Ouedraogo filed a timely notice of appeal.

## II.    Standards of Review

We review a district court's denial of a motion to suppress under a mixed standard of review, reviewing the district court's findings of fact for clear error and

its application of the law to those facts *de novo*. *United States v. Jones*, 377 F.3d 1313, 1314 (11th Cir. 2004). When considering a motion to suppress on appeal, we construe all facts in the light most favorable to the prevailing party below. *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000). A district court's conclusion on the voluntariness of a confession is a question of law we review *de novo*. *United States v. Barbour*, 70 F.3d 580, 584 (11th Cir. 1995).

This Court reviews a district court's admission of rebuttal evidence for abuse of discretion, acknowledging the trial court's "broad discretion" in the matter. *United States v. Hawkins*, 905 F.2d 1489, 1493, 1496 (11th Cir. 1990). A court may admit evidence for rebuttal purposes even if the evidence was previously inadmissible. *United States v. West*, 898 F.2d 1493, 1500 (11th Cir, 1990).

We review the district court's findings of fact related to the imposition of a sentencing enhancement for sophisticated means for clear error. *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009). "[R]eview for clear error is deferential," *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007), and "we will not disturb a district court's findings 'unless we are left with a definite and firm conviction that a mistake has been committed.'" *Clarke*, 562 F.3d at 1165 (quoting *United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005)).

### III.    Discussion

A. Motion to Suppress

On appeal, Ouedraogo contests the failure to suppress three specific categories of evidence.  We address each in turn.

*Notebook in Ouedraogo's Purse*

First, Ouedraogo contests the district court's failure to suppress evidence obtained from the officer's quick search of a notebook in her purse which she had on her person at the time of her arrest.  This notebook contained PII, including that of J.B., which caught Goldsworthy's attention.

We conclude that the search of the notebook in the purse which was on Ouedraogo's person when she was arrested was a lawful search incident to arrest. As the Supreme Court observed in *United States v. Robinson*, "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." 414 U.S. 218, 224 (1973).  In *Robinson*, the Court upheld the search of a cigarette package (which turned out to contain heroin pills) in an arrestees' pocket.  *See id.* at 236.  Because the arresting officer came across the cigarette package "in the course of a lawful search," the Court held that "he was entitled to inspect it."  *Id.*  And because the items inspected were "'fruits, instrumentalities, or contraband' probative of criminal conduct," the officer was entitled to seize it.  *Id.* (quoting *Harris v. United States*, 331 U.S. 145, 154–55 (1947)).

Under *Robinson*, then, even absent probable cause or suspicion of danger, police can routinely search individuals and personal items the individuals have on them when they are arrested and seize anything probative of proving criminal conduct. Our Circuit's application of this rule in a variety of circumstances shows that Goldsworthy's search of the notebook found in the purse Ouedraogo was holding was appropriate. For instance, in *United States v. Sonntag*, 684 F.2d 781, 786 (11th Cir. 1982), we reaffirmed an earlier ruling that wallets, including papers or packets inside them, may be searched incident to arrest. *See also United States v. Watson*, 669 F.2d 1374, 1383–84 (11th Cir. 1982) (affirming denial of a motion to suppress when items "including an address book, receipts, and a piece of paper containing names, were taken from the wallet and placed in a plastic evidence bag" pursuant to a search incident to arrest). We have also ruled that "personal papers" which are on a defendant at the time of an arrest are subject to search. *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). Thus, the search of the notebook found in her purse was within the scope of a lawful search incident to arrest.

Ouedraogo argues that her notebook should receive additional Fourth Amendment protection based on *Riley v. California*, which held that officers needed a warrant to search a cell phone seized from a defendant during arrest. *See* 573 U.S. 373, 386 (2014). The Court in *Riley* distinguished its holding from

13

*Robinson* by noting that the "privacy interests retained by an individual after arrest" in his cell phone are more significant than in regular items because cell phones "place vast quantities of personal information literally in the hands of individuals." *Riley*, 573 U.S. at 385−86. Moreover, there are "no comparable risks" of "harm to officers and destruction of evidence" when the information being sought is "digital data." *Id*. Thus, the Court in *Riley* specifically limited its holding to a cell phone. *Id.* at 386.

The rationale announced in *Riley* does not extend to the search of the notebook found in a  purse because a notebook is a single, physical object, not a repository of digital data like a cell phone. Our precedent recognizes that physical objects akin to a notebook, such as "personal papers," are subject to search. *See Sonntag*, 684 F.2d at 786; *see also United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir. 1993) (upholding officer's photocopying of the contents of arrestee's notebook as a permissible search incident to arrest). Thus, Ouedraogo's arguments as to the notebook in her purse fail, and the search was lawful.

*Binder and Luggage in Hotel Room*

The second category of evidence Ouedraogo challenges comes from the search of Ouedraogo's personal effects in her hotel room, including her luggage and a larger notebook (a "binder") that was located open on the desk in the room. The binder had what appeared to be PII inside.

14

Both parties addressed whether Ouedraogo has standing[4] to contest the search of the hotel room in their briefs.  The government argues that Ouedraogo lacked standing to contest the search of the hotel room because she, as a trespasser, no longer had a legitimate privacy interest in the room.  Ouedraogo contends she had a reasonable expectation of privacy in her personal belongings within the room, even if she did not have such an expectation for the room itself.  In the alternative, the government argues that we can affirm because the suitcase search was reasonable as part of an inventory search.

We find it unnecessary to address those issues.  First, with respect to the suitcase, even if the district court erred by failing to suppress evidence within the suitcase, the error was harmless.  A constitutional error does not always require reversal.  *See Chapman v. California*, 386 U.S. 18, 22 (1967).  Errors may be considered harmless only where the government can show beyond a reasonable doubt that the error did not influence the verdict in the case.  *Id.* at 24.  We have applied that rule to the admission of evidence and the denial of a motion to suppress when the "other evidence against the appellants was [ ] overwhelming."  *United States v. Villabona-Garnica*, 63 F.3d 1051, 1055 (11th Cir. 1995); *United States v. Fortenberry*, 971 F.2d 717 (11th Cir. 1992) ("A district court's erroneous

---

[4] Our use of the term "standing" in this opinion refers to Fourth Amendment, not Article III, standing.  *See United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc).

admission of evidence does not warrant reversal if the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.").

Sections 1029(a)(2) and (a)(3) prohibit the knowing, and with intent to defraud, use of one or more unauthorized access devices to obtain anything of value totaling over $1,000, and the possession of 15 or more of such unauthorized or counterfeit devices. Section 1028A(a)(1) prohibits the knowing possession or use of another person's identity in relation to a felony. Putting aside any evidence found within Ouedraogo's suitcase, the government presented overwhelming evidence at trial proving that Ouedraogo had violated those statutes. Any purported error with respect to admission of evidence found within the suitcase was therefore harmless. *See United States v. Alexander,* 835 F.2d 1406, 1411 (11th Cir. 1988) (admission of evidence from an improper search harmless error because "the government's [other] evidence at trial was more than sufficient to convict").

And second, with respect to the binder, we need not reach the standing issue, either, because the plain-view doctrine applies. The plain-view doctrine permits the warrantless seizure of an object where an officer is lawfully located in a place from which the object can be plainly viewed, the officer has a lawful right to access the object, and the incriminating character of the object is "immediately

16

apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir.2006).  Here, the hotel had given the officer's permission to enter Ouedraogo's former hotel room and the binder was open on the desk in the hotel room in such a way that allowed Goldsworthy to identify immediately the illicit PII inside.  So, the plain view exception applies.

*Statements Made in Custody*

Finally, Ouedraogo contests the admission of statements she made during her interview at the police station following a signed waiver of her *Miranda* rights. She argues that the district court should have suppressed these statements because the detectives' refusal to dispense her medication, coupled with their request that she waive her right to silence, constituted an implicit threat that she would not get medical treatment unless she signed a waiver.  She asserts that this implicit threat made her statements involuntary.  *See Bell v. State of Ala.*, 367 F.2d 243, 247 (5th Cir. 1966) (for a confession to be free and voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence").

Police coercion is a necessary component to finding that a defendant "involuntarily" waived her right to remain silent.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Even if Ouedraogo believed that she could not receive medical treatment until she talked, or that her medical condition affected her to the point

17

where she felt she had to speak, her statements could not be excluded as involuntary unless objectively coercive police conduct was the cause of her distress. *See United States v. Barbour*, 70 F.3d 580, 584–85 (11th Cir. 1995) (defendant's severe mental depression did not render statements involuntary because there was no "psychological or physical coercion" from the questioning agents); *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992) ("Unless police or other state actors exerted coercive tactics, [defendant's] confession was voluntary.").

The record here reveals no police coercion. Ouedraogo asked the detectives whether she should sign the waiver, and Goldsworthy told her he could not give any advice. She asked a few times for medicine, and though the detectives said she could not have it, they asked if she needed medical assistance. When she responded that she did, one of the detectives immediately stepped out and called an ambulance. The whole process took around 90 seconds. The paramedics who took her to the hospital found her "alert" and "oriented" with a normal mental state. There is no threat or even implication of a threat from the record which would render Ouedraogo's statements involuntary. Furthermore, the district court viewed video of the interview and concluded that no coercion had occurred. On this record, that factual finding is not clearly erroneous.

18

In the absence of coercion, Ouedraogo cannot show her confession was involuntary, and therefore the district court was correct to deny her motion to suppress those statements.

B.  Admission of Pre-Mirandized Statements at Trial

Ouedraogo objects to statements elicited by the government at trial during its redirect examination of hotel security officer Murphy.  We find that these statements were properly admitted to rebut an insinuation of cooperation with authorities made by the defense.

This Circuit allows evidence that is otherwise inadmissible, such as extrinsic evidence of a defendant's state of mind, to be admitted "on redirect as rebuttal evidence, when defense counsel has opened the door to such evidence during cross-examination."  *United States v. West*, 898 F.2d 1493, 1499–500 (11th Cir. 1990).  "The district court has broad discretion in admitting rebuttal evidence." *United States v. Hawkins*, 905 F.2d 1489, 1496 (11th Cir. 1990).  Rebuttal evidence is testimony used "to explain, repel, counteract, or disprove the evidence of the Adverse party " such that "if the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution 'accepting the challenge and attempting to rebut the proposition asserted.'"  *United States v. Delk*, 586 F.2d 513, 515–16 (5th Cir. 1978) (quoting *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir. 1963)).  There is no error allowing evidence on rebuttal simply

19

because it would have been impermissible to introduce that evidence during the government's case-in-chief. *Delk*, 586 F.2d at 519.

Here, defense counsel asked two questions of Murphy during his cross-examination that implied Ouedraogo had been cooperative with the government from the beginning of the investigation: first, when the officers initially encountered her at the hotel, whether Ouedraogo "provided" "her name" when she was asked; and second, whether Ouedrago "answered the questions" the officers posed. Both questions were answered in the affirmative. It was only then, on redirect, that the government elicited Ouedraogo's initial, untruthful statements to the police. The information the government elicited—that Ouedraogo lied to the police about her name and her relation to J.B.—was intended to "explain, repel, counteract, or disprove" defense's position that Ouedraogo cooperatively answered the questions she was asked. *Delk*, 586 F.2d at 516. Lying to the police is certainly different than cooperating with them.

"When the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution's accepting the challenge and attempting to rebut the proposition asserted." *United States v. Hall*,

20

653 F.2d 1002, 1006 (5th Cir. 1981).  By attempting to characterize Ouedraogo as cooperative, defense counsel opened the door to the pre-*Mirandized* statements.[5]

C. Sophisticated Means Sentencing Enhancement

Ouedraogo's final argument on appeal is that the district court clearly erred by imposing an enhancement for sophisticated means.  We disagree.  The Sentencing Guidelines state that, if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means," the offense level is increased by two.  U.S.S.G. 2B1.1(b)(10)(C).  In the notes, the Advisory Committee defines "sophisticated means" as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, cmt. (n.1).  As an example, the notes describe a situation in which a defendant "in a telemarketing scheme, locat[es] the main office of the scheme in one jurisdiction but locat[es] soliciting operations" elsewhere, and further "hid[es] assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  *Id.*

---

[5] To the extent Ouedraogo argues that her defense counsel was "only" trying to fix a misleading statement the witness said during direct rather than opening the door to a new point, we do not find that gloss to be a fair reading of the record of Murphy's cross examination. Defense counsel first elicited testimony that Ouedraogo had walked towards the officers, then asked about something unrelated, before trying to insinuate that Ouedraogo was forthcoming with the officers.

Ouedraogo's conduct falls within the general sort of conduct our Circuit has deemed to be "sophisticated means."  In *United States v. Ghertler*, 605 F.3d 1256 (11th Cir. 2010), defendant engaged in a series of actions described by the court as follows:

> Mr. Ghertler had to conduct extensive research on the victim companies to develop inside information which facilitated the scheme to defraud; used unwitting couriers to pick up and deliver some of the proceeds of his frauds in an effort to conceal the scheme; forged false company documents, on at least one occasion referencing a confidential internal account number to facilitate the execution of his scheme; and had funds transferred to the accounts of unwitting third parties, who in turn withdrew and transferred cash to him.

*Id*. at 1268.  We held that the district court did not err in applying the enhancement, reasoning that "the totality of these activities carried out over an extended period of time" was "sufficient to support" the court's application of the enhancement.  *Id*. at 1267–68.  Likewise, in *United States v. Campbell*, a defendant "utilized campaign accounts and credit cards issued to other people to conceal cash expenditures in a deliberate attempt to impede the discovery of both the existence and extent of his tax fraud."  491 F.3d 1306, 1315 (11th Cir. 2007).  We concluded that the "unusual spending pattern" was sufficient to warrant the sophisticated means enhancement, as it was an attempt to conceal his fraud on the government.  *Id*. at 1315–16.  Finally, in *U.S. v. Barrington*, a defendant "installed keyloggers" onto computers "using stealthy means and personal contacts" to obtain passwords each time the company changed its passwords.  648 F.3d 1178, 1199 (11th Cir. 2011).  We

22

upheld the enhancement because "each of these attempts involved a great deal of planning and inside information" and required the defendants to learn to negotiate a computer system which in turn required the defendants to access the computers "on multiple occasions to practice and learn." *Id*.

The government identifies four aspects of Ouedraogo's criminal conduct that parallel the cases cited above: (1) Ouedraogo was engaged in a repetitive and lengthy course of conduct, (2) she exploited loopholes in the electronic reservation system that allowed her to check in without using an identification card, (3) she created online guest accounts, and (4) she used aliases in order to do so. We agree that these aspects of Ouedraogo's conduct match the actions of the defendants in *Ghertler*, *Campbell*, and *Barrington*. In addition, Ouedraogo used eleven phones, four credit cards, key cards from several different hotels, and a knowledge of the Hilton online reservation system that Ouedraogo managed to use in a unique way to effectuate her fraud. As we said in *Ghertler*, the evidence is sufficient for a sophisticated means enhancement. *Ghertler*, 605 F.3d at 1267–68. Thus, we affirm her sentence.

## IV.    Conclusion

We find the evidence in this case compels an affirmance on all grounds. The motion to dismiss was correctly denied, the district court did not err in admitting

rebuttal evidence, and the district court did not clearly err in imposing the sophisticated means enhancement.

**AFFIRMED.**